**UNIVERSITY CHRISTIAN CHURCH, Appellant,**

v.

**CITY OF AUSTIN, et al., Appellees.**

No. 14637.

Court of Appeals of Texas, Austin.

April 25, 1990.

Rehearing Overruled May 23, 1990.

Elizabeth G. Bloch, Hilgers & Watkins, P.C., Austin, for appellant.

Ken Oden, County Atty. and Kathy D. Boutchee, Asst. County Atty., for appellees.

Before POWERS, CARROLL and ABOUSSIE, JJ.

ABOUSSIE, Justice.

This case is here on remand from the Texas Supreme Court. The appeal arises from the judgment of the district court finding that certain properties owned by appellant are subject to ad valorem taxation. We will affirm the trial court's judgment.

Appellant University Christian Church is near the University of Texas at Austin campus in an area where the demand for parking spaces is extremely high. Across the street from its sanctuary building, appellant owns two lots that it uses for church parking and that it leases to Allright Parking of Austin, Inc. Allright operates the lots as a commercial parking venture and pays appellant a minimum monthly rental plus a percentage of gross receipts.

Appellees filed suit against appellant to collect delinquent ad valorem taxes assessed against the two lots. Appellant defended on the basis that it is exempt from taxation by virtue of Texas Tax Code Ann. § 11.20(a)(1) (Supp.1990). The jury found against the church on an essential element

of its defense. The trial court rendered judgment for appellees on the verdict, and the church appealed.

In our initial disposition of the case, we reversed the judgment, holding that the evidence conclusively established as a matter of law that the property in issue was used primarily for religious worship and for that reason the jury's failure to so find necessarily was against the great weight and preponderance of the evidence, as well. *University Christian Church v. City of Austin,* 724 S.W.2d 94 (Tex.App.1988). Upon review, the Supreme Court reversed our decision, holding that there was some probative evidence to support the jury's verdict and, thus, the matter had not been conclusively established. *City of Austin v. University Christian Church,* 768 S.W.2d 718 (Tex.1988). The Court further held that in our reversal we failed to comply with the guidelines for factual sufficiency review set out in *Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986), and remanded the case to this Court for that purpose.[1] 768 S.W.2d at 718, 721.

To qualify for an exemption under section 11.20(a)(1), appellant must prove that the real property in issue is (1) owned by a religious organization, (2) used primarily as a place of regular religious worship, and (3) reasonably necessary for engaging in religious worship.[2] A place of religious worship is not limited to the church sanctuary but also includes the grounds and structures necessary for the use and enjoyment of the church, and may include a parking lot used in connection with regular religious worship. 768 S.W.2d at 719. *See Trinity Methodist Episcopal Church v. City of San Antonio,* 201 S.W. 669, 670 (Tex.Civ.App.1918, writ ref'd). Occasional secular use does not disqualify the property from exempt status, so long as religious worship remains its primary use and all income accruing to the church from the secular use is devoted exclusively to the maintenance and development of the property as a place of religious worship. 768 S.W.2d at 720; Tex.Tax Code Ann. § 11.20(d) (1982).

The parties stipulated that appellant owned the property, and the jury found that the parking lots are necessary for enabling religious worship at this church. It is undisputed that the church uses all its rental payments appropriately. The jury failed to find, however, that the property is used *primarily* as a *place* of religious worship. Assuming these lots are places of regular religious worship, the jury by its answer failed to find that this was their primary use. Unless this was proven to be the primary use, appellant is not entitled to the tax exemption for the lots. Primary use is a fact question for the jury. 768 S.W.2d at 720.

> A holding that a verdict should be directed is implicitly a finding that there was no evidence to support a contrary verdict.... Since we find there is no evidence to support a verdict other than one qualifying appellant for the exemption, we also find the jury's finding to the contrary was against the great weight and preponderance of the evidence. 724 S.W.2d at 97. We cannot see how our holding can be in doubt, notwithstanding the Supreme Court's conclusion that our analysis was flawed.

1. The Texas Supreme Court noted that it could not determine whether we ruled on appellant's factual sufficiency complaint. Our earlier opinion states as follows:

> Appellant asserts that the jury's answer to special issue number one was against the great weight and preponderance of the evidence. Appellant also contends that the trial court erred by not directing a verdict granting the church an exemption based on the evidence presented. We sustain both points of error.... A review of the record below reveals a complete absence of evidence to support any finding that the primary use of the sanctuary was not religious worship.

724 S.W.2d at 95. There then followed a several page discussion of the issues, the evidence, and the controlling law as applied to these facts. This Court then continued:

> Because we find that the trial court should have directed a verdict for appellant, we need only address in an ancillary manner appellant's point of error challenging the jury's finding on the primary use of the parking lots.

2. Section 11.20(a)(3) exempts from taxation a religious organization's residential real property used by its clergy unless it produces revenue. Section 11.20(a)(1) does not contain a similar limitation for other income-producing real property. Indeed, section 11.20(d) contemplates that the real property may produce income from a secular use without loss of exemption.

The jury answered in the negative when asked whether "the real property owned by [appellant], including the sanctuary and the parking lots, is used primarily as a place of regular religious worship." In our earlier review, we relied upon the fact that the evidence conclusively established that the *sanctuary* was used for religious worship and that the lots were essential for access to the sanctuary. The Texas Supreme Court, however, held that the question should have been submitted only with respect to the *parking lots* because the exempt status of the sanctuary and its primary use was never in dispute. In effect, the court treated the jury question as if it only inquired about the lots, as that was the only property about which a negative answer could have been given. The Court held that we erred in deciding that the lots are used primarily for worship as a matter of law because the commercial lease arrangement constituted some contrary evidence. The Supreme Court instructed us on remand to determine from all the evidence whether the jury's failure to find that the parking lots were used primarily for religious worship was against the great weight and preponderance of the evidence, applying the *Pool* guidelines. We limit our review accordingly.

■ In reviewing factual sufficiency points of error, we will consider all of the evidence to determine whether the findings of the jury are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In reversing the judgment for factual insufficiency, we must detail the evidence relevant to the issue under consideration and clearly state why the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. We also must state in what regard the contrary evidence outweighs the evidence in support of the verdict. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 652 (Tex.1988); *Pool*, 715 S.W.2d at 635. Of course, we are not free to substitute our judgment for that of the jury, even though we may have reached a different result.

■ For the most part, the evidence is undisputed; the parties merely disagree as to the conclusion to be drawn from that evidence. For example, it is clear that the church is a place of religious worship, that the two lots in dispute comprise the church's only parking lot, that they are used for parking vehicles, and that no actual worship service is conducted on the lots. It also is undisputed that Allright operates a profitable parking business on the same lots. Thus, the lots have two uses, one as a church parking lot and another as a commercial public parking lot. It was the jury's duty to decide whether the church's use was the primary one.

Appellees argued to the jury and again to this Court on remand that, because no acts of worship were conducted on the lots, they could never be considered a place of religious worship. Therefore, that could not be their primary use. We cannot say whether the jury's negative answer in part may have resulted from this argument. The Supreme Court recognized that a parking lot may qualify as a place of religious worship, and the jury found that these lots were reasonably necessary for religious worship. 768 S.W.2d at 720.

Further, the Supreme Court held that under these facts the church is not foreclosed from establishing that the primary use of the lots is religious, despite the partial secular use, the income to the church, and the resulting profit to a third party. Appellees' attempted construction otherwise "[improperly] shifts the inquiry from how the property is primarily used to whether the church controls the secular use." 768 S.W.2d at 720. The jury could, of course, consider the nature and extent of the commercial venture. The question before this Court is whether the jury's failure to find that the lots were used primarily for religious purposes is so against the great weight and preponderance of all the evidence as to be manifestly unjust. Upon careful review, we must hold that the jury's answer was not manifestly unjust.

A strong case can be made on behalf of the church. Dr. Ervin Crain, minister of the church, testified that the parking lots

are used by those attending Sunday morning worship services, Sunday School, and other regular Sunday events such as evening worship and afternoon religious studies and socials. He further testified that the property is used extensively throughout the week by the church staff, and by those attending devotionals, college group meetings, choir practices, concerts, weddings, funerals, Texas Bible Chair classes held in conjunction with the University of Texas, as well as by congregation members seeking to meet with staff members or to use the chapel for private meditation and prayer. Floyd Savage and Hugh Eckols, long-time members of both the church and its governing board, substantially repeated this testimony. All three witnesses testified that all who participate in these activities depend on using the lots.

The lots unquestionably serve purposes of primary importance to the religious institution. They are the essential means of providing access to the church building. They contain a total of approximately fifty spaces to serve three hundred members, comparable to the reasonable needs of the congregation, albeit inadequate. The evidence showed with almost no dispute that were it not for the two lots in question, this church could not continue, and that the availability of parking in this location is a vital component of the church's ministry for at least two reasons. First, the lots permit church members to utilize their sanctuary building and engage in church activities. Second, the lots play a role in attracting new members to the church. Four of appellant's five witnesses stated that the availability of parking has an impact on this congregation's growth comparable to other ministerial programs. Without the lots, the church probably could not pursue its ministry. Without the lots, the church might well have no ministry.

Under the lease terms, the church retains use of seven parking spaces at all times and may use seven more spaces every Wednesday evening. The church has exclusive use of the lots on Sundays and is entitled to the same right for part of eighteen additional days per year and at any other time with twenty-four hours notice.

The evidence shows that the church uses the lots seven days each week; Allright operates its commercial venture only six days. During those remaining six days, roughly 14% of the lot is always used by the church for its full-time staff. The church office is open from 8:30 a.m. to 5:30 p.m., and the chapel is open from 8:00 a.m. to 10:30 p.m. People regularly visit the church during these hours. On Wednesday evening of each week, choir members park twenty to twenty-five cars, filling roughly half the lot. The third Wednesday evening of each month, another twenty-five to thirty church board members use the lot to attend the meeting. All church members may obtain a sticker to place on their automobile windows identifying the vehicles as belonging to members of the church. The witnesses testified concerning the many times the church uses the lots in addition to regularly scheduled occasions. The lease contains the terms under which the church uses the lots as a matter of right. The evidence shows that in practice the relationship between the parties is such that Allright allows the church generous use of the property. Sometimes those going to the church exceed the number of reserved spaces. Often, the church requests Allright to vacate as much of the lot as the church needs on short notice, and the requests have never been denied.

It may be argued that the leasing of the lots itself serves a religious use by enabling the church to use the lots for religious worship. Savage, Eckols, and Crain all testified that, from the church's view, the lease arrangement is the only viable means of maintaining the lot for church use in this congested area. Allright patrols the lots both day and night, tows the non-church cars parked in church spaces, and supplies markers and attendants to ensure adequate parking for funerals and other special activities. Although appellees argued at trial that appellant's staff members could just as easily patrol the lots themselves, the testimony of the above three witnesses was that such an arrangement would not be, and historically has not been, feasible or successful due to cost,

time, and manpower pressures. R.L. Anderson, a church member and appellant's long-time controller, testified that even fencing the lots was not feasible because a fence likely would be torn down.

The evidence shows that Allright's lease has not significantly altered the actual use of the lots, except to the extent that there is now a profit made from that use. Before the church leased the lots to Allright, the lots were regularly filled by cars not connected with the church, and the church used the lots only to the extent it could do so in competition with unrelated and unregulated users. In other words, the lots had both a religious and a secular use in spite of the church's needs. Since the property has been leased, it continues to have mixed use, but the evidence shows that the commercial use has not diminished the religious use but instead has facilitated it. Thus, because of the location of these lots in a congested area, the church apparently cannot avoid their dual use, but it contends that the evidence shows that their primary use remains religious.

Appellees concede that church parking lots in general are considered part of the sanctuary and not taxed *unless,* as in this instance, the lots are income-producing. In addition, we note that appellees could tax Allright's leasehold estate instead of the church's property interest. Tex.Tax Code Ann. § 23.13 (1982).

Appellant had the burden to prove its entitlement to the tax exemption. Despite the evidence favorable to the church, it failed to do so. *See Davies v. Meyer,* 541 S.W.2d 827, 829 (Tex.1976). We cannot reverse the jury's verdict unless we find that it is against the great weight of the evidence so as to be manifestly unjust, shocks the conscience, or clearly demonstrates bias, and that, in addition, the evidence contrary to the verdict greatly outweighs that supporting the verdict. It may be that the church's purpose in using the lots and its primary use of them is religious; nevertheless, although evidence clearly suggests that *one use* made of the lots is religious, we are compelled to hold

that the jury's failure to conclude that the *primary use* of the lots is religious worship is supported by the evidence.

The evidence shows that more "Allright cars" park on the lots during the week than "church cars." The lots are used by the public for parking six days a week, twenty-four hours a day. The lots have no signs indicating their connection with the church, except temporary ones sometimes placed on stakes for an occasional event. Otherwise, the commercial signs permanently on the lot and other posted information reflect that the lots belong to the Allright business and are commercial parking lots. The secular use is not occasional, but continuous. Allright has been leasing the lots since 1977, and the business has consistently been successful of the lots for its business, subject to certain rights retained by the church. From fifteen hundred to five thousand paying cars *per month* use the lots while their owners are engaging in activities *unrelated* to the church. The public has used the lots in this manner throughout the leasehold period.

In light of this evidence, we cannot say that the jury's verdict was against the great weight of the evidence. The volume of public cars utilizing the lots pursuant to the Allright lease alone is such that the jury could reasonably conclude that the primary use actually made of the lots is for non-worship activities. Each month, Allright pays the church $500 rental; it is entitled to receive a monthly sum three times that amount; thereafter, any balance is divided equally between them. The church's secular use of the property is as a leasehold. Revenue from the lots goes into the general operating budget and is appropriately expended, but that revenue represents a substantial portion of appellant's total income each year.[3] Anderson testified that appellant's total property maintenance is twice the amount derived from the parking lot operation, although only about $1000 of that was spent on lot maintenance

---

**3.** Income figures for 1980–84 for lot revenue to church.

annually.[4]

The church recognizes that it could have attempted to police the lots on its own. Instead, it chose to lease the property for a commercial venture. Appellant's witnesses testified that other means of keeping enough spaces available had failed in the past, were logistically unworkable, or were too expensive. Moreover, it is irrelevant whether appellant itself could have secured the lot. The only question is how the property is used, rather than how it could have been used.

Because there was probative evidence that the lots have a secular use and they are not used primarily for religious worship, we cannot say that the jury's failure to find that the lots are used primarily as a place of religious worship was against the great weight and preponderance of the evidence so as to be manifestly unjust, even though we may have decided the issue differently. Thus, we cannot reverse the trial court's judgment based upon the jury's verdict. The judgment of the district court is affirmed.

---

4. Church maintenance costs, 1980–84.